IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2018 Session

**STATE OF TENNESSEE v. ERNESTO DELGADILO RODRIGUEZ**

**Appeal from the Criminal Court for Knox County**
**No. 105765   Bobby R. McGee, Judge**

_____

**No. E2017-00369-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Ernesto Delgadilo Rodriguez, of resisting arrest and assault.  The trial court sentenced the Defendant to six months for the resisting arrest conviction and to eleven months and twenty-nine days for the assault conviction.  On appeal, the Defendant challenges (1) a jury instruction of the definition of "arrest"; (2) the sufficiency of the evidence; and (3) the admissibility of evidence regarding alcohol and drug use.  After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Ernesto Delgadilo Rodriguez.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme Allen, District Attorney General; and Kyle Hixson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

At approximately 7:20 a.m. on July 9, 2014, Officers Frederick Kimber and Thomas Thurman of the Knoxville Police Department ("KPD") responded to a 9-1-1 call of a domestic incident involving an intoxicated individual.  The officers were advised that the Defendant had a knife and had slashed the tires of a van.  As they drove toward the

location, the officers were advised that the Defendant had been drinking and using cocaine, that he had left the residence where the domestic incident occurred, that the person who called 9-1-1 did not see the knife in the Defendant's possession when he left, and that the Defendant was wearing a white shirt, a gray hat, and jean shorts.

Officer Kimber saw the back of a man, later identified as the Defendant, wearing the clothes that were described and walking down a road near the residence. As Officer Kimber approached the Defendant in his patrol car, the Defendant looked back at him "a couple of times" but continued to walk down the road. Officer Kimber believed, based on his nineteen years of experience with the KPD, that the Defendant may have been preparing to run. Officer Kimber pulled his patrol vehicle "as close as possible" to the Defendant and exited the vehicle. He asked the Defendant what was going on, and the Defendant did not respond. He then asked if the Defendant lived down the road, and the Defendant replied, "yes." He again asked what was going on, but the Defendant did not respond. Officer Kimber could smell "a very strong odor" of alcohol on the Defendant and noticed "something on his face." The Defendant's "pupils were huge," which Officer Kimber found strange for that time of day. The Defendant's shirt appeared as though "somebody had pulled on him," and the shirt collar was not lying flat.

Because Officer Kimber did not know if the Defendant still had a knife or any other weapons, he asked the Defendant to put his hands on the patrol car and frisked him. Officer Kimber asked the Defendant if he understood, and the Defendant replied affirmatively and complied. Officer Kimber did not find any contraband or weapons during the frisk. Officer Kimber then stated, "[H]ere's what's going to happen. I'm going to place you in handcuffs. You're not under arrest right now. We're just going to go back here and find out exactly what all is going on." Officer Kimber testified that the Defendant was not free to leave at that point because he did not know whether anybody had been injured or what was going on with the domestic dispute.

Officer Kimber grabbed a set of handcuffs from his belt and placed a cuff on the Defendant's left wrist. He explained that he normally keeps the handcuffs "pretty loose" until he has the handcuffs secured over both wrists. The Defendant complied as Officer Kimber cuffed his left hand, but when Officer Kimber reached for the Defendant's right hand, the Defendant removed the hand from the car and "reached straight down and grabbed his pants." Officer Kimber kept his hold on the Defendant's left arm and repeatedly told the Defendant to give Officer Kimber his right arm. The Defendant responded multiple times that he would give him his hand but then would not do so. The Defendant was "sweating profusely," and every time Officer Kimber was able to reach the Defendant's right hand, the hand would slide out of his grip.

- 2 -

The Defendant, with his left hand secured in a cuff and his right hand free, leaned away from the patrol car and swung his elbow at Officer Kimber. Officer Kimber knocked the Defendant's arm forward, and the Defendant turned toward Officer Kimber with his fist drawn. Officer Kimber feared that the Defendant would try to hit him, so he did a "leg sweep," where he pressed his left leg and right hand on the Defendant and pulled him to the ground. Officer Kimber testified that if he could get the Defendant to the ground, then he could hold him there until backup arrived. He stated that a "leg sweep" was the easiest way to do so. The Defendant "hit the ground pretty hard," the left side of his face hit the concrete, and his arm "went flying out." Officer Kimber tried to grab the Defendant's right arm, but he put it underneath his body where Officer Kimber could not reach it.

Officer Kimber noticed that he had blood on his arm, and both of his knuckles were bleeding from scraping the concrete. Blood was "pouring" from the Defendant's nose. Officer Kimber informed the Defendant that he was bleeding and that the blood was getting on Officer Kimber. Officer Kimber had one of his knees on the Defendant's lower back and his other knee on the Defendants' shoulder area. He considered the Defendant to be "controlled" and explained that the Defendant "wasn't moving as much." He asked for police backup through his radio. He again demanded that the Defendant give him his right hand, and the Defendant responded that he would and to "let [him] up." The Defendant still would not give his right hand to Officer Kimber, and then the Defendant did a "one-arm push-up" with Officer Kimber still on top of him. At this point, Officer Kimber jumped to his feet, grabbed the Defendant, and moved the Defendant from the front driver's side of the patrol car to the back of the car.

Officer Kimber then tried to get the Defendant to bend over the car and pulled the Defendant's left arm to his right side to try to "lock him up." Officer Kimber got his taser out and warned the Defendant that he would tase him. He testified that he did not tase the Defendant because the police are trained not to tase someone who appears to be in a state of "excited delirium" since there is "a good chance you could kill [him]." He described "excited delirium" as when a person has been drinking or using drugs, is sweating profusely, gets "crazy energy or strength," and "kind of go[es] out of control." Because he feared that the Defendant was in this state and because he could see Officer Thurman's vehicle coming toward them, he decided not to tase the Defendant.

Officer Thurman, who began working with the KPD in 2007, was on his way to respond to the domestic incident call but joined Officer Kimber after Officer Kimber asked for backup with the Defendant. Officer Kimber had told Officer Thurman over the radio to "step it up" in a "frantic" manner. This sent off "red flags" in Officer Thurman's mind because he had worked with Officer Kimber for a number of years, and Officer Kimber had never asked him to "step it up" before. Officer Thurman was also concerned

because when he attempted to check on Officer Kimber, there was a long pause on the radio before he responded. Officer Thurman arrived on the scene and noticed that Officer Kimber and the Defendant were "in a struggle." Officer Kimber appeared to be "in distress" and "distraught." His eyes were wide, and his breathing was heavy. Officer Thurman was concerned because he could not see the Defendant's right hand and believed his hand was close to Officer Kimber's belt, where his firearm and pepper spray were located.

Officer Thurman tried "tearing" at the Defendant's right arm, which proved unsuccessful. He then struck the Defendant on the "meaty portion of [his] shoulder blade area" with four "hammer strikes." He tugged at the Defendant's arm again but still could not reach it. Officer Thurman noticed that Officer Kimber was getting tired, so he told Officer Kimber that they needed to take the Defendant to the ground. The Defendant was "hollering and screaming," and he appeared "distraught" and "very agitated." Officer Thurman struck the Defendant with his knee three times on the Defendant's "back hamstring area." The Defendant was still standing, so Officer Thurman grabbed him around his shoulders and began pulling at the Defendant while Officer Kimber tried to do "a sweep or a hip toss." The three men eventually all fell to the ground together.

The Defendant continued to scream. Officer Kimber landed on his back, the Defendant landed on his stomach, and Officer Thurman landed on top of the Defendant's back. Officer Thurman continued to demand the Defendant to give him his hand. The Defendant "was flailing around, throwing his head back, just kicking and everything." He then started to roll over and lift Officer Thurman off of the ground. The Defendant raised his fist, and Officer Thurman could see that the Defendant's face was bleeding. The Defendant continued to scream, which Officer Thurman compared to a "battle cry," and he was "spitting fluids all over [Officer Thurman]." Officer Thurman then "bear-hugged" the Defendant's arm, but the Defendant "ripped it away." Officer Thurman, fearing that the Defendant was going to hit him, struck the Defendant's right cheek.

KPD Officer Travis Baker arrived on the scene, and Officer Thurman instructed Officer Baker to secure the Defendant's right arm. With Officer Baker's assistance, the officers were able to finish handcuffing the Defendant. The Defendant was rolled onto his side so he could breathe better. The Defendant was taken to a hospital by ambulance. A photograph of the Defendant taken at the hospital on July 9 and a photograph of the Defendant when he was taken to jail on July 10 were entered into evidence.

Ms. Teresa Hatfield testified that she was the aunt of the Defendant's girlfriend and called 9-1-1 on July 9, 2014. Ms. Hatfield stated that the Defendant and his girlfriend were living together and that Ms. Hatfield had stayed at their residence on the night of July 8 through the morning of July 9. She testified that there were four minor

children, ages four to ten, in the house. The Defendant was not home on July 8 and returned to the residence around 7:00 or 7:30 a.m. on July 9. Ms. Hatfield testified that she did not know where the Defendant had been, that she assumed he was "partying," and that she was mad at him when he arrived in the morning. She described him as being in a "fairly good mood" when he first arrived home, but he later became angry when he could not locate his wallet.

A redacted recording of the 9-1-1 call was entered into evidence and played for the jury. The call was consistent with Ms. Hatfield's testimony and also reflected that Ms. Hatfield told the 9-1-1 operator that the Defendant had a knife and that she was standing in the driveway with the Defendant's girlfriend and the children. She agreed she told the 9-1-1 operator that the Defendant had been drinking and using cocaine, but she denied stating that someone had taken the Defendant's cocaine away from him. She stated that she did not know what the Defendant had been doing all night because she was not with him. Over the defense's objection, the State played a portion of the 9-1-1 recording that had been redacted from the version admitted into evidence. The trial court allowed this portion of the call to be played as a prior inconsistent statement for impeachment purposes only.[1] After listening to the recording, Ms. Hatfield clarified that she stated in the 9-1-1 call that the Defendant's girlfriend "must have thr[own] the cocaine away." She further clarified that she did not say that his girlfriend actually threw any cocaine away. She agreed that she asked his girlfriend whether she had been cut and that she asked the children if they were okay. She was aware that the Defendant had slashed the tires on the van so his girlfriend could not leave.

On cross-examination, Ms. Hatfield testified that she was "upset" that the Defendant had been gone all night. She agreed that sometimes the Defendant played pool at a house nearby. She acknowledged that they used chalk around the pool table and that the chalk consisted of a white powder. She agreed that the Defendant never came toward her while holding the knife. She agreed that when the 9-1-1 operator asked if the Defendant had been using drugs or alcohol, she responded, "I guess." She testified that when the Defendant left the residence, she saw him throw the knife into the yard of a vacant house.

Officer Kimber testified that the primary concern in any domestic dispute is always safety. He stated that once officers arrive at the scene, they will try to determine exactly what is happening, who the aggressor is, and whether anyone is injured. Both Officer Kimber and Officer Thurman testified about the training they received on the progressing levels of force to use with an individual who is not complying with law

---

[1] The redacted portion was not included in the record on appeal.

- 5 -

enforcement. Officer Kimber explained that on July 9, 2014, he had his firearm, pepper spray, and a taser. Officer Thurman had the same tools, plus an extendable baton.

Audio and video recordings from Officer Kimber's and Officer Thurman's patrol cars were also admitted into evidence. The video from Officer Kimber's car did not have any audio during his initial interaction with the Defendant, which was when Officer Kimber stated he was speaking with and frisking the Defendant. Additionally, the Defendant and Officer Kimber cannot be seen on the video from Officer Kimber's car. The video from Officer Thurman's patrol car, however, had audio and showed the Defendant and Officer Kimber when Officer Thurman arrived on the scene. When Officer Thurman struck the Defendant with his knee, however, the three men could no longer be seen in the video. The audio and video recordings were consistent with the officers' testimony.

Officer Kimber testified that as the Defendant was transported to the hospital, he learned that the Defendant had an arrest warrant for failure to pay child support. He acknowledged on cross-examination, however, that he did not know whether the Defendant was aware of the warrant at the time. He denied ever pulling the Defendant's left arm when he was reaching for the Defendant's right arm. He agreed that it is possible to hurt someone when handcuffing them. On redirect examination, he testified that "arrest" has many meanings. He stated that, based on his experience, telling a person that he is under arrest means that he is being detained and going to jail on criminal charges.

Officer Thurman testified that he had to receive medical testing after the fight with the Defendant due to the fluids that got onto his arms and face and into his mouth. On cross-examination, he acknowledged that Officer Kimber did not use the code on the radio that would indicate he was involved in a physical altercation. He also agreed that he did not request an intoxication test to be performed on the Defendant. On redirect examination, he was asked about the training he received on "excited delirium." The defense objected on the grounds that Officer Thurman was not a doctor and was not "qualified" to testify about "excited delirium." The trial court determined that if Officer Thurman had an understanding of the meaning of the term, then he could testify about his understanding. He then explained the training he had received about "excited delirium," which was consistent with Officer Kimber's testimony. Officer Thurman also testified that he has never requested an intoxication test to be given when an individual is arrested for a charge other than driving under the influence.

The defense elected not to present any proof at trial. The Defendant was charged with resisting arrest in Count 1, assault of Officer Kimber in Count 2, and assault of Officer Thurman in Count 3. The jury returned guilty verdicts for Counts 1 and 2 and a

not guilty verdict for Count 3. The Defendant was sentenced to six months for Count 1 and to eleven months and twenty-nine days in Count 2. The Defendant now appeals.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in allowing the jury instruction on the definition of "arrest." He also challenges the sufficiency of the evidence to support his convictions. He finally asserts that the trial court erred in allowing the State to impeach Ms. Hatfield with the portion of the 9-1-1 call that included her statements regarding the Defendant's drug and alcohol use, and in denying his request for a mistrial.

### I. Jury Instruction

The Defendant argues that the trial court erred in defining "arrest" consistently with its definition for constitutional purposes, that the definition was too broad, and that the instruction was an improper comment on the evidence by the trial court. The State requested the following instruction, which was given over the defense's objection:

> "Arrest" means the taking, seizing or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. An arrest may be effected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under the legal authority of the arresting officer.

The Defendant argued that the definition was too broad and would confuse the jury. The trial court noted that the Tennessee pattern jury instructions for resisting arrest did not include a definition of arrest. However, the court believed the definition of arrest was "a very important issue" in the case, noting that arrest has a "street" definition and a "technical, legal meaning." The trial court concluded that the definition was accurate and made the jury instructions complete.

"[A] defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The propositions of law governing a case should be plainly stated to the jury, so that the jury can comprehend the principles involved. *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App. 1995). "[A] jury charge should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." *State v. Hatcher*, 310 S.W.3d 788, 812 (Tenn. 2010)

(quoting *Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007) (internal quotations omitted). We review jury instructions in their entirety and not in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008).

The trial court will often employ pattern jury instructions to properly instruct the jury, and such instructions must occasionally be revised or supplemented in order to fully and accurately state the applicable law. *State v. Robinson*, 239 S.W.3d 211, 228 (Tenn. Crim. App. 2006). "Trial courts are not limited to the mere recitation of the pattern instructions." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010). An erroneous jury instruction, however, may deprive the defendant of his constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34. A charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

The Defendant argues that the definition of arrest was too broad and confused the jury. The jury instruction here was consistent with our supreme court's definition in *State v. Crutcher*, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citing *West v. State*, 425 S.W.2d 602, 605 (Tenn. 1968)), where the court defined "arrest" for the purpose of a search incident to arrest. *See also State v. Ingram*, 331 S.W.3d 746, 757 (Tenn. 2011). The Defendant argues that "arrest" should be defined narrowly for the offense of resisting arrest. He specifically asserts that the trial court erred in using a definition designed for constitutional issues such as search and seizure. We see no justification in defining "arrest" differently in this context than it is defined in other criminal contexts. Tennessee Code Annotated section 39-16-602(a) makes it an offense to prevent or obstruct law enforcement "from effecting a stop, frisk, halt, arrest, or search." The distinctions between the terms "stop," "frisk," "arrest," and "search," are important in a constitutional context because they implicate different levels of individual protections. *See Ingram*, 331 S.W.3d at 756 (describing the "three distinct levels of interaction between citizens and law enforcement officials"). In contrast, the Legislature did not distinguish between these terms in section 39-16-602(a), and instead, grouped them together and made it an offense to prevent or obstruct law enforcement from effecting any of these terms.

Moreover, the term "resisting arrest" has been used for a conviction under this statute, even when the defendant was not formally arrested and charged with a crime at the time he resisted. *See State v. Jeremy D. Parvin*, No. E2014-01569-CCA-R3-CD, 2015 WL 2128585, at *3 (Tenn. Crim. App. May 6, 2015) (holding the evidence was sufficient to support a resisting arrest conviction where a defendant struggled with an officer as he attempted to handcuff him while the officer completed his investigation of an alleged domestic assault); *State v. John Lindsey, III*, No. E2011-00052-CCA-R3-CD,

2012 WL 5392156, at *6 (Tenn. Crim. App. Nov. 5, 2012) (holding the evidence was sufficient to support a resisting arrest conviction where a defendant was stopped by officers, was ordered out of his vehicle, "reached for something in the compartment" of his car, and "struggled" with the officers as they attempted to handcuff him). Through our research, we have yet to find a case where a Tennessee court has used a separate definition of arrest for the purpose of an offense under Tennessee Code Annotated section 39-16-602(a).

It is clear from our reading of the trial transcript that whether the Defendant was under arrest at the time Officer Kimber handcuffed him was at issue during the trial. The trial court recognized this as an important issue in the case and agreed that a definition of "arrest" was necessary. The definition given is consistent with our supreme court's definition in a constitutional context. We, therefore, conclude that the definition given here was accurate and did not mislead the jury. *See Hatcher*, 310 S.W.3d at 812.

The Defendant also argues that the jury instruction was an improper comment on the evidence. "In Tennessee, judges are constitutionally prohibited from commenting upon the credibility of witnesses or the evidence in a case." *State v. Hester*, 324 S.W.3d 1, 89 (Tenn. 2010); *see* Tenn. Const. art. VI, § 9 (providing that "judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). Our supreme court has cautioned that a trial judge "must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989). "It is natural that jurors should be anxious to know the mind of the court, and follow it. Therefore, a court cannot be too cautious in his inquiries." *McDonald v. State*, 14 S.W. 487, 488 (1890). However, "not every comment on the evidence made by a judge is grounds for a new trial." *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004). We must determine, in the overall context of the case, if the trial court made comments which were prejudicial. *Id.* (citing *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993)).

The Defendant takes issue with the following portion of the jury instruction: "seizing or detaining of the person of another, either by touching or *putting hands on him*." (emphasis added). He argues that this "comes dangerously close" to Officer Kimber's testimony that he put his hands on the Defendant and that such instruction "crosses the line that judges should not comment on the fact[s]" of the case. The State responds that the instruction does not reference the facts of the case or suggest a particular factual conclusion. It further argues that Officer Kimber's action of putting his hands on the Defendant would not even meet the definition provided unless the jury also determines that he was arrested, detained, or seized. We agree with the State. The definition does not suggest to the jury that the trial court favored the State's case or was

crediting the testimony of Officer Kimber. The jury instruction includes an important caveat that the jury must find "actual restraint on the arrestee's freedom of movement under the legal authority of the arresting officer." A jury could conclude under this definition that the Defendant's freedom of movement was not actually restrained even though Officer Kimber testified that he put his hands on him. The Defendant is accordingly not entitled to relief on this ground.

## II. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence to support both of his convictions. When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted). The court determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). "'[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Id.* (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). This court does not reweigh the evidence. *Id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Instead, "'a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts' in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

The Defendant was convicted of assault of Officer Kimber and resisting arrest. Assault occurs when a person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." T.C.A. § 39-13-101(a)(2) (2014). Additionally, "[i]t is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer … from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." T.C.A. § 39-16-602(a). "Force" is defined as "compulsion by the use of

physical power or violence and shall be broadly construed to accomplish the purposes of this title." T.C.A. § 39-11-106(a)(12). A defendant may still be guilty of resisting arrest even if the arrest was unlawful. *See* T.C.A. § 39-16-602(b).

The Defendant argues that he could not be guilty of resisting arrest because he was not being formally arrested. However, as noted above, an arrest need not be a formal arrest where a defendant is being taken to jail and charged with a crime. Instead, the correct determination is whether "a reasonable, innocent person would not feel free to leave" and whether there is "'actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.'" *State v. Bishop*, 431 S.W.3d 22, 35 (Tenn. 2014) (quoting *State v. Echols*, 382 S.W.3d 266, 278 (Tenn. 2012). Even though Officer Kimber told the Defendant he was not being arrested, the Defendant was informed he would be handcuffed and transported to the residence. *See State v. Nidiffer*, 173 S.W.3d 62, 65-66 (Tenn. Crim. App. 2005) ("[W]hile not dispositive, an officer's telling a defendant he is under arrest is a substantive factor to consider when determining whether an arrest has occurred."). A jury could determine that the Defendant was restrained from movement and not free to leave when Officer Kimber began handcuffing him and told him he was taking him back to the residence. *See Crutcher*, 989 S.W.2d at 301-02; *see also State v. Christopher Douglas Smith*, No. W2015-01826-CCA-R10-CD, 2017 WL 993071, at *4 (Tenn. Crim. App. Mar. 14, 2017) (holding defendant was under arrest even though the officer who handcuffed him told him he was being detained rather than arrested), *no perm. app. filed*.

The Defendant asserts that he was not under arrest at the time the struggle ensued and that the evidence showed he was "completely cooperative." He also notes that he was hospitalized after his encounter with the police and that he could be heard screaming on the admitted recordings.

In the light most favorable to the State, the facts established that Officer Kimber responded to a domestic dispute and was told that the Defendant had a knife. When Officer Kimber encountered the Defendant, he smelled alcohol on him and noticed his eyes were dilated. The Defendant would not answer Officer Kimber's questions but did comply with a frisk of his person. Officer Kimber then instructed the Defendant that he was going to be handcuffed and taken back to the residence. The Defendant complied as Officer Kimber cuffed one of his hands but began to resist when Officer Kimber tried to put the handcuff on the other hand. The Defendant pushed away from the car and swung his elbow toward Officer Kimber. The struggle to secure the Defendant's other hand continued until two other officers arrived on the scene and helped to hold the Defendant down so they could finish handcuffing him. We conclude that the evidence was sufficient to support the Defendant's convictions.

### III. Admissibility of Evidence Regarding Alcohol and Drug Use

The Defendant argues that the trial court erred in allowing the State to impeach Ms. Hatfield with the portion of the 9-1-1 call in which she stated that the Defendant had been drinking and using cocaine. He also maintains that the court erred in allowing Officer Thurman to testify about the term "excited delirium."

The Defendant first asserts that the trial court erred in allowing the State to play a redacted portion of the 9-1-1 recording, in which Ms. Hatfield told the operator that the Defendant had been drinking and using cocaine. The record shows that prior to trial, the State filed a notice of its intent to introduce evidence of other crimes, wrongs, or acts, which included the evidence that the Defendant had been drinking and using cocaine on the night before his arrest. The trial court granted the motion in part and denied it in part; however, the record does not reflect which parts of the motion were granted and which parts were denied. The State also filed a pretrial notice to introduce a recording of the 9-1-1 call made by Ms. Hatfield, and the trial court held that the State could introduce only the portions of the recording that related to the Defendant's wielding a knife and Ms. Hatfield's fear.

The party calling a witness may attack the witness's credibility, Tenn. R. Evid. 607, and a prior inconsistent statement may be admissible to challenge the credibility of a witness. *See State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000) (noting that Tennessee cases "have consistently held that a prior inconsistent statement is admissible under the Rules of Evidence when the prior statement is used to impeach the credibility of a witness"). Extrinsic evidence of a prior inconsistent statement may be used only when the witness is afforded an opportunity to deny or explain the statement and the opposing party is afforded an opportunity to cross-examine the witness. Tenn. R. Evid. 613. Such extrinsic evidence is admissible when the witness "either denies or equivocates to having made the prior inconsistent statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998).

Here, Ms. Hatfield agreed that she told the operator the Defendant had been drinking and using cocaine, but she insisted that she did not know what the Defendant had been doing that night because she was not with him. She also denied telling the operator that someone had taken cocaine away from the Defendant. The State then asked to play a portion of the 9-1-1 recording that had been redacted, and the Defendant objected and referenced the trial court's pretrial order. The trial court held that the portion of the recording could be played for impeachment purposes only and could not be considered as substantive evidence. After the recording was played, Ms. Hatfield was given an opportunity to explain her statements, and the defense cross-examined her regarding her statements about the Defendant's drug use. *See* Tenn. R. Evid. 613. We

conclude that the trial court properly allowed the portion of the recording to be played as a prior inconsistent statement for impeachment purposes. Moreover, any error in allowing the prior inconsistent statement was harmless because the information — that the Defendant had been drinking and using cocaine — was admitted into evidence in the written records from the 9-1-1 call and the audio recordings from dispatch's relaying the information to the responding officers. *See State v. Rodriguez*, 254 S.W.3d 361, 373-74 (Tenn. 2008) (holding that harmless error exists only where it is more probable than not that the error affected the verdict or judgment); Tenn. R. App. P. 36(b). The Defendant did not object to either of these exhibits.

As part of the challenge to the admission of the evidence, the Defendant also asserts that the court erred in denying his motion for a mistrial premised on the impeachment of Ms. Hatfield with the 9-1-1 recording. "Whether to grant a motion for mistrial is a matter within the trial court's discretion." *State v. Henretta*, 325 S.W.3d 112, 129 (Tenn. 2010) (citing *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009); *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003)). The trial court should grant a mistrial only when there is a manifest necessity for such action. *Saylor*, 117 S.W.3d at 250. "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Id.* An appellate court will only disturb a trial court's granting or denial of a mistrial when the record demonstrates an abuse of discretion. *State v. Johnson*, 401 S.W.3d 1, 21 (Tenn. 2013) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)). Because we conclude that the use of the redacted recording was proper for impeachment purposes or that any error was harmless, the trial court did not abuse its discretion in denying a mistrial on this ground.

The Defendant further challenges Officer Thurman's testimony regarding the term "excited delirium." We first note that the Officer Thurman's testimony did not arise until after the Defendant's motion for a mistrial had been denied, and such motion was not renewed during Officer Thurman's testimony. Regardless, the Defendant is not entitled to relief on this ground. When the State questioned Officer Thurman about "excited delirium," the Defendant objected, arguing that Officer Thurman was not a doctor and was not qualified to testify about the term. The trial court concluded that Officer Thurman could testify about his understanding of the term based on his training. Officer Thurman did so and did not testify as to whether he believed the Defendant was in a state of "excited delirium." Officer Thurman did not give any expert testimony, and instead, gave lay testimony about his own understanding of what a term means. *See* Tenn. R. Evid. 602 (allowing witness testimony when witness has personal knowledge of the matter). This testimony was relevant to the motivations of the officers in refraining from using a taser on the Defendant. We conclude that the trial court did not err in allowing Officer Thurman to testify about his understanding of "excited delirium." Moreover, any error is harmless since the jury had already heard Officer Kimber's testimony about the

term without any objection from the Defendant. *See Rodriguez*, 254 S.W.3d at 373-74; Tenn. R. App. P. 36(b).

## CONCLUSION

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE